FILED
2006 Aug-02 PM 03:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **EDGAR JEREMY HUDSON and ORLANDO JONES,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )     **2:05-CV-1033-VEH** |
| | ) |
| **BIRMINGHAM JEFFERSON CONVENTION COMPLEX (BJCC)** | ) |
| | ) |
| **Defendant.** | ) |

## <u>Memorandum Opinion</u>

Pending before the Court is the Motion for Summary Judgment (doc. 19) filed by Defendant Birmingham Jefferson Convention Complex, ("BJCC") as to Plaintiff Edgar Hudson's ("Hudson") and Plaintiff Jones's ("Jones") claims of a hostile work environment under 42 U.S.C. § 1981, as well as Alabama State law claims of outrage and claims of negligent retention and negligent supervision. The issues have been extensively brief and are now ripe for determination.

## I.      Procedural History

On May 18, 2005, Plaintiffs filed a complaint in this Court alleging the following: (1) that Plaintiffs were subjected to a racially hostile work environment

(Count One); (2) that the Defendant acted outrageously and intentionally subjected the Plaintiffs to racially profane, insensitive, derogatory, and unprofessional language and conduct (Count Two); and (3) that the BJCC was negligent in its retention and supervision of its employees (Count Three).

On April 28, 2006, the BJCC filed a Motion for Summary Judgment asserting that: (1)Plaintiffs cannot establish a prima facie case for a racially hostile work environment; (2) Plaintiffs have not presented sufficient evidence to prove that the Defendant committed the state law tort of outrage; and (3) Plaintiffs presented insufficient evidence that BJCC acted negligently in supervising and/or retaining any of its employees.

The matters have been briefed and are now ripe for determination.

## II.   <u>Relevant Facts</u>[1]

On September 20, 2004, Hudson began working for the BJCC.  (D. Ex. 1; D. Ex. 2 p. 10; D. Ex. 3).  On February 11, 2005, Jones also began working with the BJCC. (D. Ex. 4).

The following is a list of BJCC employees who were co-workers of the Plaintiffs and involved in the matters presently before the Court:

---

[1]Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to the Plaintiffs.

Jason Kelly ("Kelly"), Caucasian
Raleigh Myrick("Myrick"), African American
Larry Wright ("Wright"), Caucasian
David[2] ("David"), Caucasian
Larry Capps ("Capps"), Caucasian
Harlin ("Harlin"), Caucasian
Roy Miller ("Miller"), Caucasian
Williams Bowdre ("Bowdre"), African American
Elizabeth Sturdivant ("Sturdivant"), African American
Henry Johnson ("Johnson"), African American

The following is a list of BJCC supervisors involved in the matters presently before the Court:

Rod Roper ("Roper"), Caucasian
Johnny Pate ("Pate"), Caucasian
Matt Wilson ("Wilson"), Caucasian
Willie Dillard ("Dillard"), African American
Troy Martin ("Martin"), Caucasian.

The following is a list of BJCC Human Resources Department employees involved in the matters presently before the Court:

Elma Bell ("Bell"), African American
Regina Blalock ("Blalock"), Caucasian.

## Occurrences of Racial Harassment

Plaintiffs allege that BJCC's employees used racial slurs and comments around

---

[2]The name "David" is the only information presented in the record as to this BJCC employee.

and directed towards the Plaintiffs while Plaintiffs were employed at the BJCC.  The following are pertinent examples:

Hudson overheard the following:

Jason Kelly, a co-worker, ask Raleigh Myrick, another of Plaintiffs' co-workers, "Why do black people get so mad when you refer to them as 'niggers'? Raleigh is my nigger." (D. Ex. 2 p. 40).

Employees discussing BJCC Supervisor Rod Roper's affair with Roper's "Black Project", a term used when referring to the affair he had with an African American employee named Nikki in the Housekeeping Department. (D. Ex. 2 pp. 43-44).

The following are instances wherein Plaintiffs allege to have been confronted with racial epithets and the like during their employment at the BJCC:

Hudson claims that Larry Wright, Plaintiffs' co-worker, has called other African American employees "nigger";[3] he explained to Wright that calling someone a "nigger" is very serious and that Wright should never say it again, to which Wright replied, "Okay. Then alright, Sambo." (D. Ex. 2 p. 54).

On November 6, 2004, Hudson heard Kelly say that "black people are crazy. Jay-Z can use the word 'nigger' in his lyrics; but when I use the word 'nigger', blacks

---

[3]Kelly testified that he heard Wright refer to both Plaintiffs as "niggers" on more than one occasion. (D. Ex. 14 pp. 24-28).

want to get mad." (D. Ex. 2 pp. 63-65).

On December 5, 2004, Kelly said to Hudson, "Hey Edgar, I don't know why you people get so angry when people call y'all niggers; nigger, nigger, nigger, nigger, it is just a word." (D. Ex. 2 pp. 66-67). Hudson responded that the word was initially used to do harm. (D. Ex. 2 p. 67).

On December 9, 2004, Wright said, "all you jig-a-boos, blacks, or whatever you are, need to be put back on a boat and sent back to Africa." (D. Ex. 2 p. 68). Troy Martin, a BJCC supervisor, was present and told Wright, "you cannot say things like this in front of these people."[4] (D. Ex. 2 . 68).

On January 20, 2005, as Hudson drank from a water fountain, Wright yelled, "Hey, black boy, don't drink out of our fountain; it is for whites only. We are going to make a sign, 'whites only' and get another water fountain for the 'coloreds.'" (D. Ex. 2 p. 70). Roper and Johnny Pate, a BJCC supervisor, were present and laughed at Wright's comment. (D. Ex. 2 p. 70).

On February 19, 2005, Wright noticed that Jones was wearing his shirt untucked and he asked Jones, "you think this is the hood, homeboy?" (D. Ex. 13 p. 27).

---

[4]Martin was also present on February 11, 2005 and March 19, 2005. (D. Ex. 2 p. 71; D. Ex. 2 pp. 78-79; D. Ex. 13 p. 29).

On February 26, 2005, Wright told Hudson that he had "some darkies for neighbors and [he] hope[d] that they [didn't] mess up the neighborhood." (D. Ex. 2 pp. 75-76).

On March 10, 2005, a co-worker named David told Hudson that the word "nigger" does not bother David when it is said. (D. Ex. 2 pp. 76-77).

On March 19, 2005, Wright made his "send blacks back to African" comment for the third time in the presence of both Plaintiffs and Martin. (D. Ex. 2 pp. 78-79; D. Ex. 13 p. 29). Unlike the two (2) previous instances, on this occasion Wright was not warned against making this type of comment. (D. Ex. 2 p. 79).

On March 19, 2005, in a conversation with Jones, Kelly described Rapper Jay-Z as being "a big nigger". (D. Ex. 13 pp 29-30).

On March 22, 2005, Jones was assembling pipes with co-workers Larry Capps and Harlin. When Capps got black soot on his face and hands from the piping, Capps grabbed Jones's shoulders and said that he wanted to see if the black marks would show up on Jones's face. (D. Ex. 13 p. 36).

On March 24, 2005, Hudson told Wright that he was not comfortable with him directing racial slurs at him or calling him by derogatory names such as "nigger", "black boy", and "jig-a-boo". (D. Ex. 2 pp. 80-81). Wright responded, "Should I call you 'porch monkey?'" (D. Ex.; 2 p. 81).

6

On March 29, 2005, in a meeting with Pate, Roper, and Hudson, Pate said that the "N" word had been used in his presence before and that he did not think it was a big deal. (D. Ex. 2 p. 84).

On May 14, 2005, Myrick told Jones about an incident wherein Myrick had a black eye and Capps said that he could not tell whether Myrick had a black eye or not. (D. Ex. 13 pp. 50-51).

**Plaintiffs' Alleged Complaints to Human Resources**

In November of 2004, because he had heard the word "nigger" used so frequently at the BJCC, Hudson asked Elma Bell, the Human Resources employee in charge of anti-harassment policy training, if she had heard any complaints of racial abuse. (D. Ex. 2 pp. 49-50).  Bell told Hudson that she had not heard anything, but that he should come back if such conduct did not cease. (D. Ex. 2 p. 50).

Hudson alleges that he reported Wright's "Sambo" comment to Bell the day after the incident occurred. (D. Ex. 2 p. 54).

On or about March 21, 2005, Hudson telephoned Bell about the following: (1) racial comments that Wright had been making since Hudson's employment began; (2) the general complacence and aquiescence of the employees regarding the common use of the "N" word; (3)Wright's "send blacks back to Africa" comments; (4) Wright's "water fountain" comment; and (5) that the terms "porch-monkey" and "jig-

a-boo" had been used frequently by employees at the BJCC. (D. Ex. 12 p. 26; D. Ex. 12 pp 26-27; D. Ex. 12 p. 27).

On the same day, Bell reported Wright's "boat" and "water fountain" comments, and Kelly's "Jay-Z comment" to Regina Blalock, the Director of Human Resources. (D. Ex. 112 pp. 30-31) On or about March 20, 2005, Jones met with Bell and Blalock to discuss racial comments Jones had heard. (D. Ex. 13 pp. 32-34). Blalock told Jones that Wright had been involved in prior incidents regarding racial harassment. (D. Ex. 13 p. 35). Blalock then asked Jones if he wanted Roper and Pate to join them at the meeting. Jones did want them at the meeting and the two supervisors joined them. (D. Ex. 13 p. 35).

Roper and Pate were shocked about Kelly's use of the "N" word, but they mentioned that Wright was "crazy" and that they had experienced problems with him previously. (D. Ex. 13 p. 35). Roper specifically commented that he was not surprised at Wright's comment "put the blacks on the boat back to Africa"; he turned to Bell and apologized for the incident.[5] (D. Ex. 12 p. 40).

During this meeting, Blalock told Bell that she had been informed by Sturdivant that Wright used the term "token black" to describe an African American

---

[5]Kelly also testified that he heard Wright refer to both Plaintiffs as "niggers" on more than one occasion. (D. Ex. 14 pp. 24-28).

employee. (D. Ex. 13 p. 32).  Bell went to retrieve Wright's personnel file and found

no write-up or documentation regarding Wright's "token black" comment.  (D. Ex.

12 p. 39).

In April of 2005, Hudson told Blalock about the racial issues and animosity he

had encountered while working at the BJCC, to which Blalock responded, "What do

you want me to do? We could fire everybody if that is what you want." **(**D. Ex. 2 p.

96).

## Human Resource's/Management's Response to Plaintiffs's Complaints

On or about March 23, 2005, Blalock and numerous BJCC supervisors had a

meeting, wherein Roper, Pate, and Matt Wilson reprimanded Blalock for allowing

Bell to "blow the situation out of proportion". (D. Ex. 11 p. 82; Pl. Ex. A - Bell

Notes; D. Ex. 20 p. 59).  Wilson also said that he and Pate used the "N" word all the

time with Dillard, an African American supervisor for the BJCC. (D. Ex. 11 p. 82).

Subsequently, on March 29, 2005, Roper and Pate interviewed Hudson. (D. Ex.

2 p. 83).  Hudson claims that the majority of the meeting was focused on ascertaining

who, between the two Plaintiffs, initially reported their complaints to Human

Resources. (D. Ex. 2 p. 86).  Later that day, Roper and Pate interviewed Jones and

asked him similar questions. (D Ex. 13 p. 39).

The interviews resulted in Wright receiving a disciplinary write-up for his

comment regarding sending blacks back to Africa and Kelly receiving a verbal warning regarding the use of the "N" word. (D. Ex. 11 p. 121;D. Ex. 15).

## Incidents After the Harassment Was Reported

On April 8, 2005, after a meeting was held for the BJCC employees on the subject of harassment and cultural sensitivity, Wright said "I guess H.R. wants us to apologize to Orlando. This is 2005. I am not apologizing to any mother fucker. I say what I want."[6] (D. Ex. 2 p. 88).

On April 12, 2005, Hudson claims that Martin ignored his call regarding an alarm sounding during Hudson's night shift. (D. Ex. 2 pp. 90-91). Hudson further asserts that Martin continued to ignore him the following day. (D. Ex. 2 p. 91). On April 16, 2005, Hudson alleges that Martin harshly told him to tuck in his shirt, despite the fact that other employees are able to wear their shirt untucked without any reprimand from management. (D. Ex. 2 p. 94).

On April 19, 2005, Martin publically reprimanded Jones for a minor incident, an incident that generally does not provoke a reprimand. (D. Ex. 13 pp. 42-43).

In May 2005, (pursuant to a doctor's excuse) Hudson did not report to work because of stress. (D. Ex. 2 pp. 101-102). Blalock called Hudson and told him that

---

[6]In this meeting, which covered many topics but not the topic of racial slurs, employees were told to be respectful to other employees's race, religion, etc. (D. Ex. 2 p. 89-90).

they could no longer hold his position. (D. Ex. 2 p. 101).  Hudson faxed Blalock a letter of resignation on May 12, 2005. (D. Ex. 2 p. 10; D. Ex. 18).  Jones resigned on May 23, 2005. (D. Ex. 13 p. 59; D, Ex. 19).

### III.  Standard of Review

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324.

The substantive law will identify which facts are material and which are

irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its

initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV.    Applicable Substantive Law and Analysis

### A.    <u>Hostile Work Environment</u>

Both Plaintiffs allege that the BJCC subjected them to a racially hostile work environment.  A hostile work environment exists where the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive working environment.  Civil Rights Act of 1964, §701 *et seq*.,  as amended, 42 U.S.C.A. §2000 *et seq*.  To establish a hostile work environment claim, a plaintiff must show that: (1) he belongs to a protected group; (2) he has been subject to unwelcome  harassment; (3) the harassment was based on a protected characteristic of the employee, such as national origin; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for said environment under a theory of vicarious or direct liability.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

The fourth element, whether the conduct was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," is the element that often tests the legitimacy of most harassment claims.  *Gupta v. Fla.*

14

*Bd. of Regents*, 212 F.3d 571, 583 (11th Cir.2000).

To establish that harassing conduct was severe or pervasive, an employee must meet both a subjective and objective test. *See Mendoza v. Borden*, 195 F.3d 1238, 1246 (11th Cir.1999). The employee must establish not only that he subjectively perceived the environment as hostile, but that a reasonable person would perceive the environment to be hostile. *See Watkins v. Bowden*, 105 F.3d 1344, 1355-56 (11th Cir.1997). The "mere utterance of an epithet which engenders offensive feelings in an employee... does not sufficiently affect the conditions of employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (internal quotations and citations omitted). "Racial slurs spoken by co-workers ha[ve] to be so 'commonplace, overt, and denigrating that they create[] an atmosphere charged with racial hostility.'" *Edwards v. Wallace Cmt. Coll.*, 49 F.3d 1517, 1521 (11th Cir.1995) (quoting *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir.1990)).

It is undisputed that both Plaintiffs satisfy the first three prongs of the racially hostile work environment prima facie case. Therefore, the issues remaining before this Court are as follows: (a) whether the harassment suffered by the Plaintiffs was sufficiently severe or pervasive so as to alter the terms and conditions of their employment and create a discriminatory working environment and (b) whether there

is a basis for holding the employer liable in these circumstances.

**1. Whether the harassment was subjectively pervasive and severe**

Plaintiffs allege that they were subjected to unwelcome harassment that included but was not limited to racial slurs, racially derogatory statements, and racially motivated actions.

The Eleventh Circuit has held that "[t]he harassing conduct must create both an objectively hostile or abusive environment - one 'that a reasonable person would find hostile or abusive' - and a subjectively hostile environment - one that 'the victim... subjectively perceive[s]... to be abusive.'" *Fleming v. Boeing Company*, 120 F.3d 242, 245 (11th Cir.1997) (quoting *Harris*, 510 U.S. at 21-22, 114 S.Ct. At 370 (1993)).

Plaintiffs claim that they were subjected to twenty-three occurrences of racial harassment throughout their eight month and twenty-three day course of employment at the BJCC.[7] (Pl.'s resp. to Def.'s mot. for sum. judg. p. 27).

In response to Wright's use of the word "nigger," Hudson said that there was

---

[7]Plaintiff Edgar Hudson began working for the Defendant BJCC on September 20, 2004 and resigned on May 12, 2005. (Ex. 3; Ex. 19). Plaintiff Orlando Jones was hired on January 26, 2005, effective February 11, 2005, and resigned from on May 23, 2005. (Ex. 4; Ex. 20). For the purposes of this action, Plaintiffs' working duration will be measured by that of Plaintiff Hudson, due to the fact that Plaintiff Jones's employment with the Defendant is shorter than that of Plaintiff Hudson, and the two Plaintiffs' claims are to be evaluated as one. Accordingly, Plaintiffs have worked for the Defendant for eight (8) months and twenty-three (23) days.

a great seriousness involved in calling someone a "nigger" and warned Wright that he should never do it again. (D. Ex. 2 p. 54).  Hudson also requested that Wright discontinue use of the racial slurs "Jig-A-Boo" and "black boy". (D. Ex. 2 p 81). Further, Jones explained that he suffered humiliation and felt "stupid" after an incident occurred involving Capps who, after finding that he had a black substance on his face, grabbed Jones by the shoulder and said that "he wanted to see if the black marks would show up" on Jones's face as well. (D. Ex. 13 p. 36).  Both Plaintiffs reported the incidents and occurrences to the Human Resources Department as well as to their supervisors, Roper and Pate, further illustrating Plaintiffs' discomfort with the harassment.

Viewing the facts in the light most favorable to the Plaintiffs, Plaintiffs have established that they  subjectively perceived the complained-of harassment as being pervasive and severe.

## 2. Whether the Harassment was Objectively Pervasive and Severe

Plaintiffs claim that the alleged harassment was sufficiently pervasive and severe so as to satisfy the objective prong of the hostile work environment test.

Plaintiffs allege that they were subjected to racially hostile behavior from both their co-workers and their supervisors.

### a.    Co-worker Harassment

Where the perpetrator of harassment is merely a co-employee of the victim and not a supervisor, the employer will be held liable only if the plaintiff establishes that the employer knew or should have known of the harassing conduct but failed to take prompt remedial action. *Miller*, 277 F.3d at 1278. Therefore, the Plaintiffs' alleged complaints are only actionable if the Plaintiffs can showing either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge to the employer. *Id.*

Plaintiffs claim that the work environment at the BJCC was "blatant[ly] racis[t]". (D. Ex. 18).  Hudson claimed, in his letter of resignation, that the hostile work environment caused  negative "residual effects on [his] physical and mental health." (D. Ex. 18).  Jones alleged that he witnessed "constant derogatory comments made about African Americans." (D. Ex. 19).  Plaintiffs allege twenty-three specific incidents of co-worker racial harassment throughout their course of employment with the BJCC.  Plaintiffs claim that Kelly used the "N" word on numerous occasions around both Plaintiffs.   Wright called Plaintiffs racial slurs such as "Sambo", "darkie", "jig-a-boo", "black boy", and "porch monkey".  Plaintiffs also claim that Wright made racially derogatory remarks on a regular basis.  For example, while in the presence of Plaintiffs and Martin, Wright said on three separate occaisions "send blacks on a boat back to Africa"; in the presence of Roper and Pate, Wright made his

"water fountain" comment.  Plaintiffs also explained that they learned from Blalock about another racial comment made by Wright, wherein he referred to an African American employee as being the "token black".  Capps also made racial comments around the BJCC, including a comment made to Jones regarding whether black soot from piping would show up on Jones's face due to the fact that Jones is an African American.  Capps made a similar remark to Myrick, commenting that Capps would not be able to tell if Myrick ever had a black eye.

Plaintiffs claim that Wright's "send blacks back to Africa" comments and his "water fountain" comment were all witnessed by supervisory BJCC employees, which represents **actual knowledge** of examples of a hostile work environment.  Also, Plaintiffs show that  Pate, in a meeting with Hudson and Roper, admitted that he did not see the usage of the word "Nigger" as being a "big deal".  In her deposition, Blalock said that Pate and Wilson used the word "Nigger" with Dillard at times.  The supervisors were using prohibited racial language and found no problem with its use.  This illustrates that the BJCC possessed actual knowledge of the hostile work environment.

Upon discovery of Plaintiffs' complaints about Wright, supervisors were not surprised to hear of Wright's  use of racially offensive slurs.  Roper and Pate agreed that Wright was "crazy" and they had previously had problems with him.  Plaintiffs

also claim that they reported many instances of harassment to the Human Resources Department, thereby placing the BJCC on notice that racial comments and slurs were being used.

From this evidence, a reasonable person may find that a racially hostile work environment was created by Plaintiffs' co-workers. Further, there is a genuine issue of material fact as to whether the BJCC supervisors knew or should have known about the working conditions alleged by the Plaintiffs. As such, these comments and slurs are sufficient to support a hostile work environment claim against the BJCC.

b.    Supervisor Harassment

"A plaintiff must establish not only that [he] subjectively perceived the environment as hostile and abusive, but also that a ***reasonable person*** would perceive the environment as hostile and abusive." *Gupta*, 212 F.3d at 583. (Emphasis added). The court has no doubt that Plaintiffs perceived the environment to be hostile and abusive; therefore, the court must determine whether this subjective perception was objectively reasonable.

The Supreme Court has stated that to constitute an actionable hostile environment, the workplace must be "permeated with 'discriminatory intimidation, ridicule, and insult.'" *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). The

Eleventh Circuit examines the evidence in light of four factors to determine whether the alleged harassment is sufficiently severe and pervasive to alter the plaintiff's terms or conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. Under the enumerated factors, the court finds that Plaintiffs have not presented sufficient evidence to illustrate that the supervisory harassment created a hostile work environment.

Plaintiffs have shown that certain of their supervisors have used the word "Nigger", but they have failed to proffer any evidence as to the frequency of the supervisors' use of such slurs.  Further, the Court notes that the supervisors' use of "Nigger", while admittedly offensive in modern society, was not of a physically threatening nature.  Finally, Plaintiffs have not established that the supervisory harassment interfered with their job performance.  Although there is evidence that both Plaintiffs resigned from their positions, or, in Hudson's circumstance,  had to miss work due to the stress, this fact alone does not establish that the BJCC was "permeated with... 'insult.'" *Morgan*, 536 U.S. at 116.  Finding that Plaintiffs cannot establish that they suffered harassment so severe and pervasive as to alter the conditions of his employment, the Court concludes that no reasonable fact finder

could find that the Plaintiffs were subjected to unlawful racial harassment by their supervisors in violation of Title VII.

Although Plaintiffs have failed to present sufficient evidence that supervisory harassment created a racially hostile work environment, viewing the facts in the light most favorable to the Plaintiffs, sufficient evidence has been presented that the Plaintiffs' co-workers' comments may sustain a hostile work environment claim.

### 3. Vicarious or Direct Liability of BJCC

The BJCC claims that (a) they are entitled to a *Faragher/Ellerth* affirmative defense which would preclude a finding of constructive knowledge on the part of the BJCC of the alleged hostile work environment and (b) the Plaintiffs did not adequately report the harassment they allege.

#### a. *Faragher/Ellerth* Defense

The BJCC asserts a *Faragher/Ellerth* affirmative defense to preclude the argument that the BJCC possessed constructive knowledge of a racially hostile work environment.

To establish the *Faragher/Ellerth* affirmative defense, a defendant employer must prove both that: (1) the employer exercises reasonable care to prevent and promptly correct any racially or sexually harassing behavior and (2) the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities

provided by the defendant or to otherwise avoid harm. *Faragher v. Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus v. Ellerth*, 524 U.S. 742 (1998).

In *Walton v. Johnson & Johnson Services, Inc.*, 347 F. 3d 1272 (11th Cir.2003), the Eleventh Circuit held that "after the employer is notified of the harassment, its remedial measures should be designed to stop the harassment, correct its effects on the employee, and ensure that the harassment does not recur." *Walton*, 347 F. 3d at 1288.

Plaintiffs have proffered evidence illustrating that although BJCC supervisors witnessed racial comments being spoken, little action was taken to correct and prevent the recurrence of the pervasive use of racial epithets.  Plaintiffs also put forth evidence illustrating that the BJCC has not responded to Plaintiffs' complaints as promptly as they have responded to and remedied previous disciplinary situations.

For example, a disciplinary situation arose in early April of 2005, resulting in Sturdivant receiving a five day suspension for being out of her work area for approximately thirty minutes, wherein she used the time to make inappropriate comments to a Security Guard regarding a colleague of Sturdivant's named Natalie Cooper.(Pl.'s Evid. Sub., Ex. A p. 6).

Another example of past disciplinary actions occurred on April 13, 2005, when

it was reported that Sturdivant had participated in horseplay in the cafeteria.[8] (Pl.'s Evid. Sub., Ex. A p. 6).  On April 18, 2005, Sturdivant was terminated. (Pl.'s Evid. Sub., Ex. A p. 6).  Clearly there is a marked discrepancy between the BJCC's prior disciplinary actions with Sturdivant and the remedial actions taken in connection with the Plaintiffs' complaints of racial harassment.  Bell claims that she had never "seen issues linger for... weeks before corrective actions were taken," as was the case concerning Plaintiffs' harassment complaints. (Pl.'s Evid. Sub., Ex. A p. 6).

Based on the record, a reasonable jury may find that the BJCC did not exercise reasonable care to prevent and promptly correct any harassing behavior.  Viewing the facts in the light most favorable to the Plaintiffs, the Court finds that the BJCC has failed to present sufficient evidence to satisfy the first prong of the *Faragher/Ellerth* affirmative defense.

As to the second prong of the *Faragher/Ellerth* affirmative defense, the BJCC asserts that the Plaintiffs failed to reasonably take advantage of preventive and corrective opportunities and improperly reported occurrences of harassment. Plaintiffs assert that the BJCC anti-harassment policy was both ineffective and

---

[8]Here, Bell mentions in her notes that Sturdivant took another employee's chocolate cake off of her tray in the BJCC cafeteria, and the employee responded by taking the cake back. (Pl.'s Evid. Sub., Ex. A p. 6).  Sturdivant again took the cake and this time "licked it and a short chase" occurred.  (Pl.'s Evid. Sub., Ex. A p. 6).

incomplete.  Further, Plaintiffs claimed that they reasonably reported occurrences of

harassment when considering the circumstances under which they had to report.

The BJCC Employee Handbook states in pertinent part:

> "An employee should report any harassment, either discriminatory or sexual, to his/her supervisor, to his/her supervisor's superior, to the Director of Human Resources, or to the Executive Director immediately or at least within ... ten (10) calender days of the incident..."

D. Ex. 9, Policy # 05.2.

> "If an employee, supervisor, or any other individual is found (after appropriate investigation) to have engaged in any type of harassment of any employee, prompt remedial action will be taken to stop the harassment and to prevent recurrence.   Such action may result in discipline up to and including termination of the offending employee(s)."

D. Ex. 10, p. 15

In *Farley v.  American Cast Iron Pipe Co.*, 115 F.3d 1548 (11th Cir. 1997), the

defendant's sexual harassment policy was unequivocally communicated to

employees, the policy offered several avenues for lodging a grievance, and the

company's thorough investigation of complaints indicated that complaints were taken

seriously and that the company adhered to its own policies. *Farley*, 115 F.3d at 1553.

Because the employer in *Farley* "developed and promulgated an effective and

comprehensive sexual harassment policy, aggressively and thoroughly disseminated

the information and procedures contained in the policy to its staff, and demonstrated

a commitment to adhering to this policy," the court found the anti-harassment policy in *Farley* to be effective and complete. *Id*. at 1554.

In *Watson v. Blue Circle, Inc*., 324 F.3d 1252 (11 th Cir. 2003), the defendant, Blue Circle Inc., had a sexual harassment policy which was disseminated to its staff and employees. *Watson*, 324 F. 3d at 1260. However, the Court cited *Farley* in finding that "'where there is no policy, *or where there is an ineffective or incomplete policy*, the employer remains liable...*" Id*.(emphasis added) (citing *Farley* 115 F.3d at 1553). In *Watson*, the court found that the plaintiff presented evidence that "call[ed] into question whether Blue Circle adequately investigate[d] and respond[ed] to allegations of sexual harassment in the workplace." *Watson*, 324 F. 3d at 1261.

The BJCC "New Hire Orientation" addresses sexual harassment; however, it does not include a racial harassment policy. (D. Ex. 5). Plaintiffs claim that the BJCC's harassment policy was ineffective as evidenced by the   following circumstances: (1) reoccurring racial slurs and racist language, such as the four instances of racial comments by Wright in the presence of supervisors and (2) the use and acquiescence of th euse of the word "Nigger" by supervisors. Plaintiffs have presented evidence to show that, unlike the Defendant in *Farley*, the BJCC did not consider the Plaintiffs' harassment complaints seriously, nor did they conduct a thorough investigation of the numerous occurrences involving the use of racially

26

derogatory terms directed at and about Plaintiffs, thereby failing to satisfy the second prong of the affirmative defense asserted by the BJCC.

On or about March 23, 2005, during Blalock's meeting with Wilson, Pate, and Roper, Blalock was reprimanded for allowing Bell to "blow" the Plaintiffs' complaints "out of proportion." (D. Ex. 11 p. 82; Pl. Ex. A - Bell Notes; D. Ex. 20 p. 59). Also, Plaintiffs claim that during both Hudson's and Jones's meeting with Roper and Pate concerning the investigation into their complaints, Roper and Pate focused more time on finding out which of the Plaintiffs initially went to Human Resources than on the merits of their harassment complaints. (D. Ex. 2 p. 84; D. Ex. 13 p. 39). Moreover, although Human Resources was aware of Wright's "token black" comment, there was no recorded reprimand in Wright's personnel file regarding this incident, nor was there any evidence that the comment was ever investigated. (D. Ex. 12 p. 39).

Plaintiffs also presented evidence illustrating that the supervisors, to whom they were supposedly encouraged to report, took no action to prevent the conduct from recurring. During a meeting Hudson had with Blalock concerning his complaints of racial harassment, Hudson addressed the issue of the ongoing harassment and general racial animosity at the BJCC that he had witnessed; Blalock responded in an aggravated tone, "What do you want me to do? We could fire

everybody if that is what you want." (D. Ex. 2 p. 96).

The BJCC failed to employ and enforce effective anti-racial harassment policies. Despite the fact that a "Workplace Harassment" framework existed, Plaintiffs presented evidence that the policy was ineffective in preventing workplace racial harassment; and despite the fact that the policy promised otherwise, the harassment reports were not taken seriously, and were not investigated in accordance with the policy. Plaintiffs also presented evidence illustrating that the supervisors and the Director of the Human Resources Department (a) responded in a hostile manner when Plaintiffs attempted to report occurrences of harassment and (b) used racial slurs themselves and condoned the use of racial epithets by other BJCC employees.

Based on the record, a reasonable jury may decide that the BJCC's harassment policy is ineffective. Further, a reasonable jury may find that Plaintiffs' conduct of reporting numerous instances of harassment was reasonable.

Viewing the facts in the light most favorable to the Plaintiffs, the Court finds that Plaintiffs have established that the BJCC is vicariously liable due to actual and constructive knowledge of the racially hostile work environment and that the BJCC's attempt at remedying this harassment appears neither prompt nor appropriate.

Moreover, Plaintiffs have established that a reasonable jury may find that a

racially hostile work environment existed for the Plaintiffs.  Accordingly, the BJCC's

motion for summary judgment is due to be **DENIED** as to Plaintiffs' claim of hostile

work environment (Count One).

## B. Plaintiff's Tort Law Claim of Outrage

Plaintiffs assert that the hostile work environment present within the BJCC

workplace amounts to a prima facie case of outrage against the BJCC.[9]  The Alabama

Supreme Court first recognized the tort of outrage in 1981 in *American Road Service*

*v. Inmon*, 394 So.2d 361 (Ala.1981).  According to *Inmon*, in order for a plaintiff to

prevail on a claim of outrage, they must show "by extreme and outrageous conduct,

[that one] intentionally or recklessly causes severe emotional distress to another." *Id*.

at 365.  The  defendant is subsequently liable "for such emotional distress and for

bodily harm resulting from the distress." *Id*.  However, as the court wrote in  *Inmon*,

the conduct must be "so outrageous in character and so extreme in degree as to go

beyond all possible bounds of decency as to be regarded as atrocious and utterly

intolerable in civilized society." *Id*.  The circumstances under which the tort of

outrage arises are therefore extremely limited. *Quillen v. Americasn Tobacco*

*Company*, 874 F.Supp 1285, 1298 (M.D. Ala.1995).

---

[9]The tort of outrage is more properly referred to as "outrageous conduct," but the Court
will accept the widely used term "tort of outrage," as is used in the case at bar by the Plaintiffs
and the BJCC.

In order to establish a claim under the tort of outrage, a plaintiff must show the following: (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; and (3) the stress was severe. *Moore v. Spiller Associated Furniture, Inc.*, 598 So.2d 835 (Ala.1992).

According to a recent Alabama Supreme Court decision, "in the twelve years since *Inmon* was decided, all cases in which this Court has found a jury question on an outrage claim have fallen within only three categories: (1) cases having to do with wrongful conduct in the context of family burials; (2) a case where insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim; and (3) a case involving egregious sexual harassment." *Thomas v. BSE Industrial Contractors, Inc.*, 624 So.2d 1041 (Ala.1993) (citations omitted).

The record in the present action contains no evidence that would support a claim that the BJCC intentionally inflicted emotional distress on Plaintiffs to a degree necessary to satisfy the first prong of a prima facie case for outrage. Moreover, Plaintiffs have presented no evidence to satisfy the second requirement of the test, regarding the extreme and severe nature of the alleged conduct.

Plaintiffs cannot prove that the actions of the Defendant in this situation are so

outrageous and extreme as to "go beyond the bounds of decency". *Inmon*, 394 So.2d at 365.  Even assuming that all of Plaintiffs' allegations of harassment are true, they do not rise to the level of being outrageous or extreme.

Regarding the third prong,  Hudson provided evidence to establish that he took a medical leave in May of 2005, due to stress at work and pursuant to a doctor's direction. (D. Ex. 2 pp. 101-102).   In their letters of resignation, both Plaintiffs claim that they have been negatively impacted by the racially hostile work environment present at the BJCC.  Hudson claims that due to "blatant racism", he was forced to resign. (D. Ex. 18).  Hudson also claims that the environment at the BJCC caused negative physical and mental effects. (D. Ex. 18).  Jones claims to have been "plagued by constant derogatory comments made about African Americans" and says that he resigned due to the "unbearable" nature of his working conditions.

A reasonable jury may find that Plaintiffs have presented sufficient evidence of severe stress due to the BJCC work environment.  However, because the Plaintiffs failed to provide evidence to satisfy the first two prongs of the prima facie case of outrage, the Defendant's motion for summary judgment is due to be **GRANTED** as to Plaintiffs' claim of a tort of outrage (Count Two).

**C.     Negligent Supervision and Retention**

Plaintiffs allege negligent supervision and negligent retention with respect to the employment of BJCC's supervisors and employees. (Doc. 1).

In order to prevail on a claim of negligent supervision, Plaintiffs must demonstrate "by affirmative proof that the alleged incompetence of the [problem] employee[s] was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence." *Portera v. Winn Dixie of Montgomery, Inc.*, 966 F. Supp. 1418, 1438 (M.D. Ala. 1998)(citing *Ledbetter v. United Am. Ins. Co.*, 624 So. 2d 1371 (Ala. 1993)).  *See also Portera*, 996 F. Supp. at 1439 (without evidence of prior complaints of sexual harassment, there was no evidence from which the employer could know that the supervisor created a hostile working environment). In addition, Plaintiffs must prove that, at the time of the complained-of conduct, the allegedly incompetent employee was acting within the line and scope of his employment.  *Nash v. Segars*, 682 So. 2d 1364 (Ala. Civ. App. 1996).

"For a master to be held liable for its servant's incompetency in the context of negligent retention, it must be affirmatively shown that, had the master exercised due and proper diligence, the master would have learned of the incompetency.  This showing may be done by showing specific acts of incompetency and showing that were they brought to the knowledge of the master, or by showing them to be of such

32

a nature, character, and frequency that the master, in the exercise of due care, must have had notice of them." *Madris v. Robbins Tire & Rubber Co.*, 669 So.2d 885 (Ala. 1995). Isolated incidents of negligence by the employee will not suffice to create a duty to terminate the problem employee. To recover for negligent retention in Alabama, a Plaintiff must show breach of the duty to terminate and that such breach proximately caused the plaintiff's injury. *Patterson v. Augat Wiring Systems, Inc.*, 944 F. Supp. 1509, 1529 (M.D. Ala. 1996).

> "Negligence, such as unfits a person for service, or such as renders it negligent in a master to retain him in the employment, must be habitual, rather than occasional, or of such a character as to render it imprudent to retain him in service. A single exceptional act will not prove a person incapable or negligent.

*Bank of Montgomery v. Chandler*, 39 So. 822, 828 (Ala. 1905).

Plaintiffs have presented evidence to illustrate that the BJCC possessed actual and constructive knowledge of the racially hostile work environment. Specifically, the behavior of Wright was known to Roper, Pate, Bell, and Blalock. Further, the BJCC has not put forth evidence that any of Plaintiffs' alleged harassment occurred outside of the scope of the accused co-employees' employment with the BJCC. The use of the "N" word by other BJCC employees, as well as the conduct of Wright and

Capps[10] towards African Americans in the BJCC, may provide evidence to a reasonable jury that proper supervision was not provided in the BJCC workplace to prevent racial harassment.

Plaintiffs have also presented sufficient evidence to present a jury question as to whether the multiple incidents of racial harassment by Wright may invoke the need for termination of specific employees by a reasonable employer. Wright's harassing conduct continued even after Martin instructed him to discontinue his "blacks back to Africa" comments. Further, as evidenced by Wright's "token black" comment, Wright had previously had complaints filed against him because of racially-based harassment.

Viewing the facts in the light most favorable to the Plaintiffs, there is sufficient evidence to show that the BJCC possessed both actual and constructive knowledge of Wright's, as well as other employee's, racially-based comments and conduct; or in the alternative, had due diligence been exercised, the conduct was easily discoverable. Moreover, a reasonable jury may find that Wright's comments and conduct created a duty for the BJCC to terminate Wright's employment, and the

_____

[10]Capps made a comment to Myrick, claiming that if Myrick had a black eye, there was no way that Capps would be able to tell. (D. Ex. 13 pp. 50-51). Capps also made a similar comment to Jones, asking if black marks from the pipes that the two were assembling would show up on Jones's face due to his race. (D. Ex. 13 p. 36).

breach of the duty caused the Plaintiffs' proximate injury in the form of humiliation brought on by enduring the racially hostile work environment present at the BJCC.

The Court finds that Plaintiffs have presented sufficient evidence to support both a claim of negligent supervision and negligent retention.  Accordingly, the BJCC's Motion for Summary Judgment as to Plaintiffs's claims of negligent supervision and negligent retention (Count Three) are due to be **DENIED.**

### V. Conclusion

For the reasons set forth above, the Defendant's motion for summary judgment is **DENIED, in part**, and **GRANTED**, **in part**, as to Plaintiffs' claims of hostile work environment as well as Plaintiffs' state law claims of outrage, negligent retention, and negligent supervision.

A separate **ORDER** will be entered.

**DONE** this 2nd day of August, 2006.


**VIRGINIA EMERSON HOPKINS**
United States District Judge